UNITED STATES of America,
Plaintiff-Appellee,

v.

Howard Franklin COBB and Maurice F. Stehman, Defendants-Appellants.

Nos. 16301, 16302.

United States Court of Appeals
Seventh Circuit.

June 10, 1968.

Rehearing Denied July 12, 1968.

Certiorari Denied Oct. 28, 1968.

See 89 S.Ct. 255.

Palmer K. Ward, Indianapolis, Ind., Robert B. Oxtoby, Springfield, Ill., for appellants.

Richard E. Eagleton, U. S. Atty., Richard J. Massa, Asst. U. S. Atty., Springfield, Ill., James G. Hatcher, Asst. U. S. Atty., Peoria, Ill., for appellee.

Before SCHNACKENBERG, SWYGERT and FAIRCHILD, Circuit Judges.

FAIRCHILD, Circuit Judge.

Howard F. Cobb, Maurice F. Stehman, Walter J. Kessler, and Gertrude M. Cobb were charged with 12 offenses against the mail fraud statute[1] and with conspiracy to violate it. Kessler was granted a separate trial and was a government witness at the trial of Mr. and Mrs. Cobb and Stehman. These three were convicted, and Mr. Cobb and Stehman have appealed.

The twelve substantive counts alleged eleven mailings and one receipt of mail, each for the purpose of executing a scheme to defraud, described in detail. Defendants do not challenge the sufficiency of the evidence.

Condensed and summarized, the scheme to defraud, alleged and proved, was as follows:

Defendants would create an identity for a sham retail business under the name of Kessler Furniture Galleries at Quincy, Illinois, induce a large number of firms to supply furniture on credit, dispose of the merchandise for cash through auction houses and like channels, conceal the proceeds, and disappear as soon as it seemed likely that further operation would be dangerous.[2]

Defendants' five contentions, and our dispositions of them, are as follows:

█ 1. *Sufficiency of the indictment.* Defendants assert that the indictment is fatally defective in that the substantive counts fail to set out the contents of the mail matter. They say they were denied sufficient notice to enable them to prepare a defense or to identify the offense charged with sufficient certainty to be able to avoid second jeopardy.

It is true that the indictment neither quotes nor summarizes the text of the mail matter, but defendants have cited no authority that this is indispensable.

In each of Counts I through XI, the indictment charged a mailing, on or about a specified date, at Quincy, alleging in some instances that the matter was a letter and in others that it was a postal card. The name and address of each addressee were alleged. In Count XII, the indictment charged receipt from the post office at Quincy of a piece of certified mail. The number of the certified article, the name and address of the sender, and the name and address of the addressee were alleged.

Count I included a very detailed description of the scheme to defraud, and this material was realleged in each other count. Each count alleged that the mailing or receipt of mail was for the purpose of executing the described scheme. One part in the alleged scheme was furnishing a false financial statement to a named mercantile agency, and Count I alleged the mailing of a letter to that agency. The object of the alleged scheme was to obtain property by fraud from named suppliers, and the alleged scheme included ordering merchandise, promising payment, and making false representations. The addressees of the mail involved in Counts II through XI, and the sender in Count XII were all suppliers named in the description of the scheme.

Defendants did not seek a bill of particulars under Rule 7(f), F.R.Cr.P., nor inspection of the articles under Rule 16 (b), F.R.Cr.P. We hold that the indictment adequately identified each piece of mail matter and sufficiently charged an offense in each count.

██ 2. *Evidence of prior and subsequent transactions.* Defendants argue the court erred in admitting testimony as to so-called "pattern" transactions in other jurisdictions and at other times.

The indictment alleged that defendants devised their scheme for the Quincy operation on or about May 1, 1965 and continuously thereafter until on or about March 1, 1966. The earliest alleged

---

1. 18 U.S.C. sec. 1341.

2. See the "scam" described in United States v. Wolcoff (7th Cir. 1967), 379 F.2d 521.

mailing was July 20, the latest, November 18, 1965.

The government introduced evidence tending to show (1) that Cobb and Stehman had engaged in similar transactions under the name of Duvall Furniture Company in Denver, Colorado, shortly before they began the Quincy operation, and (2) that they commenced to be involved in others suggesting a similar pattern under the name of Brinkley's Town and Country Interiors at Richmond, Indiana in March and April, 1966.

The district court received this evidence for the limited purpose of showing intent and instructed the jury accordingly. The similarity of the Colorado and Indiana transactions tended to show, if any additional proof were needed, that the defendants, in doing the acts which they were shown to have performed in and about Quincy, intended to defraud in the manner alleged. Within reasonable limits, evidence of similar transactions is admissible for the purpose of establishing intent.[3] The Colorado transactions occurred very shortly before and the Indiana ones very shortly after the Quincy episode. We find no abuse of discretion in receiving evidence of either.[4]

■ 3. *Alleged government impeachment of its own witness.* Kessler, an indicted defendant, awaiting separate trial, was a very important government witness. Defense counsel asked him "with whom, if anybody, did you discuss the testimony that you've now given in this court room?" Kessler answered "No one." On re-direct, over objection, the United States attorney brought out testimony that Kessler had discussed the facts, before testifying, with the United States attorney and the postal inspector. He explained that by his answer to defense counsel he had meant that once he had started his testimony (the day before) he had not talked with anyone about it.

There is probably enough ambiguity in defense counsel's question so that the re-direct lay in the area of clarification rather than impeachment, and even if deemed impeaching, the government was surprised. The record shows, as it happens, that before defense counsel began his cross-examination (out of the presence of the jury) the United States attorney had given defense counsel notes of an interview with Kessler and the postal inspector had disclosed he had conversed with Kessler, but had no notes.

Eroding defense counsel's opportunity to argue that Kessler had denied the obvious could scarcely be reversible error, in any event.[5]

---

3. Nye & Nissen v. United States (1949), 336 U.S. 613, 618, 69 S.Ct. 766, 769, 93 L.Ed. 919, 924; United States v. Shavin (7th Cir. 1961), 287 F.2d 647, 652, 90 A.L.R.2d 888.

4. See, with respect to acts occurring after the date of the offense rather than before, Roe v. United States (5th Cir. 1963), 316 F.2d 617, 621.

5. The writer's father, Edward T. Fairchild, formerly Chief Justice of the Supreme Court of Wisconsin, recorded an incident which occurred while he was studying law in an office in western New York in the 1890's. Part of the training was to handle cases before justices of the peace. He represented a defendant in a dispute over a lease of a pasture. * * *

"The case came on for trial before the justice of the peace and a jury of six men.

"My witness was not present when the trial started, but he came into the town hall just before the plaintiff had finished putting in his proof. While the jury was present I walked over to the witness and asked him about the six months agreement. He said that was understood. I asked him then to take the stand and the justice administered the oath. I asked him the relevant and material questions and he stated the situation to be as we claimed.

"On cross-examination by a young man who was studying law in a neighboring village, he was asked this question: 'Have you talked this matetr over with Fairchild?' He answered, 'No sir.' Then the student asked, 'Didn't you just have, in the presence of all of us, a conversation with Fairchild about this matter?' 'No sir' he replied. 'He did speak to you, didn't he?' 'Yes' the witness said. 'What did Fairchild say to you?' and he

■■ *4. Alleged failure to send exhibits to the jury room.* Counsel for both sides agree that the jury had the indictment while deliberating, and did not have a copy of the instructions. Although defendants suggest that it ought to be the practice to supply the jury with a copy of the instructions, the only decision they cite holds that such procedure is discretionary.[6] We are not prepared to rule otherwise.

Counsel for defendants asserts in his brief that the exhibits were not sent to the jury room. The record is silent. The government does not concede this fact and "presumes that the exhibits were available to the jury during their deliberations." The question was not raised in the district court. A presumption that the matter was properly handled is appropriate.

■ *5. Proof of venue.* The indictment charged that the mailings occurred, and in Count XII that an article of mail was received, at Quincy, Adams county, Illinois in the southern district of Illinois, southern division. Count XIII charged that defendants conspired there. There was evidence that the mailing and receipt of mail took place at Quincy and that other relevant activity of defendants occurred there. There happened to be testimony as to the location of Quincy with respect to the Mississippi river and Hannibal, Missouri, and jurors sitting in Springfield doubtless had knowledge of the approximate location of Quincy, a city of about 45,000. No witness testified, however, and the court did not instruct, on the basis of judicial notice, that Quincy is in the southern district of Illinois.

We take judicial notice that Quincy is in Adams county, that Adams county is part of the southern division of the southern district of Illinois, and that Quincy has been designated by Congress as one of the places for holding court in that division.[7] Where, as here, the geographical location where offenses were committed has been sufficiently proved, and it can be judicially noticed that such location is within the appropriate district, venue has been sufficiently proved.[8]

The judgments will be affirmed.

---

answered 'He told me to take the tobacco out of my mouth.'

"The jury laughed, the trial proceeded, and the verdict was for the defendant.

"The witness had been influenced by the common belief that one about to testify would destroy the effect of his testimony if he admitted that he had talked about the case with one of the parties in advance of the trial."

6. McDaniel v. United States (5th Cir. 1965), 343 F.2d 785, 789.

7. 28 U.S.C. sec. 93(b) (2).

8. United States v. Karavias (7th Cir. 1948), 170 F.2d 968, 970; United States v. Jones (7th Cir. 1949), 174 F.2d 746, 749; United States v. Budge (7th Cir. 1966), 359 F.2d 732.