353 A.2d 406

**COMMONWEALTH of Pennsylvania**

v.

**Keith BAKER, Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 22, 1974.

Reargued June 30, 1975.

Decided Jan. 29, 1976.

384

386

Arthur L. Gutkin, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Carolyn E. Temin, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, NIX, O'BRIEN, ROBERTS, POMEROY, and MANDERINO, JJ.

## OPINION

NIX, Justice.

Appellant, Keith Baker was convicted a jury of murder of the second degree for the death of his wife. Motions for a new trial and in arrest of judgment were filed, argued and denied. After the imposition of a sentence of five to ten years imprisonment, an appeal was taken to this Court pursuant to the Appellate Court Jurisdiction Act of 1970, July 31, P.L. 673, No. 223, Art. II, § 202(1); 17 P.S. § 211.202(1) (Supp.1975–1976).[1] We now affirm for the reasons that follow.

Police Officer Franklin was patrolling in the 7900 block of Fayette Street in Philadelphia during the early morning hours of February 20, 1973, when his attention was attracted to an unoccupied vehicle which was illegally parked. The officer attempted to ascertain the identity and whereabouts of the operator of the double-parked vehicle when he first noticed appellant and Mrs. Mary Hughes standing in the doorway of 7907 Fayette Street.[2] Appellant directed the officer to the victim who was lying on the floor inside the premises. The body of Mrs. Baker exhibited signs that she had recently sustained a severe beating. Mrs. Baker was taken by the police to the hospital where she was pronounced dead on arrival.

1. This cause was first argued before us on November 22, 1974. Thereafter, reargument was ordered and the matter was again heard on June 30, 1975.

2. It was later determined that Mrs. Hughes was the operator of the illegally parked vehicle.

After further investigation, appellant was charged as the person responsible for his wife's death.

Appellant first charges a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). See also *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); *Commonwealth v. Powell*, 449 Pa. 126, 295 A.2d 295 (1972). Appellant asserts that the testimony of two of the arresting police officers was withheld during the suppression hearing. It is now claimed that the evidence would have bolstered his position that his state of intoxication was such that he was incapable of making a knowing and voluntary statement.[3] However, it is conceded that he became aware of the information possessed by these officers, on this subject, when they testified at trial. No effort was made at that time to assert a *Brady* violation or to seek another suppression hearing during which this testimony could be introduced.[4]

Moreover, during argument on post trial motions, appellant did not assert a *Brady* claim. He was content to rest his argument on the ground that the additional evidence required a finding that the statements were involuntary.[5] Consequently, the court below was never

3. The suppression court denied the motion to suppress the first two statements but granted suppression of additional statements obtained after 11:00 A.M., February 20, 1973, on the basis of a finding of a violation of Pennsylvania Rule of Criminal Procedure 118 (now Rule 130).

4. It can also be argued persuasively that since appellant was aware of his condition he should have requested the Commonwealth at the suppression hearing to produce all of those policemen who were in a position to have observed him. Following this reasoning it could be concluded that his failure to request this testimony at the suppression hearing foreclosed the issue from further consideration.

5. During post-trial argument, counsel for appellant merely asserted that the expanded trial record on the issue justified a result different from that reached by the suppression court. At no

provided an opportunity to respond to this objection. *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974). We, therefore, will not entertain this complaint raised for the first time in this appeal. *Commonwealth v. Agie*, 449 Pa. 187, 296 A.2d 741 (1972).

█ In a related argument appellant charges that under the totality of the circumstances the court below should have found the statements involuntary. Although couched in terms of the totality of the circumstances, appellant's primary basis for this contention is that his state of inebriation was such as to render him incapable of making a knowing and voluntary confession. A review of the suppression record unquestionably supports the suppression court's ruling that the statements were made voluntarily and knowingly. Moreover, the expanded record on this subject made at trial also dictates the same conclusion.[6]

point was it suggested that this testimony was improperly withheld, which is the gravamen of the *Brady* case.

"MR. GUTKIN: (attorney for Baker) It's an issue of fact which Judge Della Porta did not hear, which would permit your Honor to overrule that Suppression hearing, if new evidence was introduced at the trial which would bear on the Suppression. And you heard the testimony to show how intoxicated he was.

THE COURT: What witnesses testified that really did not testify at the Suppression hearing?

MR. GUTKIN: All of the witnesses—all of the Defense witnesses, with the exception of Mr. Baker.

THE COURT: Are you telling me that all of the witnesses except Mr. Baker, testified, at this suppression hearing?

MR. GUTKIN: I am saying all of the witnesses did not testify at the suppression hearing, with the exception of Mr. Baker.

THE COURT: In other words, Mr. Baker was the only one that testified at the suppression hearing.

MR. GUTKIN: That is correct."

6. At trial, the testimony of the two officers which was the subject of appellant's first contention, was presented along with additional defense testimony seeking to establish a degree of intoxication which would render appellant incapable of making a knowing and voluntary statement. Appellant's position was rejected not only by the trial court who refused to reverse the earlier suppression ruling but also by the jury who obviously found his statements to be voluntary.

The second assignment of error charges that the jury panel was prejudiced by a remark allegedly made by a police officer. Appellant asserts that the prejudice was such that the only appropriate remedy would have been the dismissal of the entire panel. We do not agree.

On individual voir dire a prospective juror (who was not chosen to serve in this case) stated he overheard another prospective juror remark that a police officer in the courthouse had characterized Baker as being "particularly vicious". At a conference in chambers, the prosecutor advised the court that the remark could not have been made by any officer assigned to this case because at the time the statement was supposedly made these officers were not present in the courthouse. The court provided the defense with extra peremptory challenges and advised counsel that wide latitude would be permitted during the remainder of the voir dire to allow them to fully explore the issue. The court by its questions determined that those veniremen that had been selected up to that point had no knowledge of the comment. The Court also determined that the remaining members of the panel were also unaware of the alleged statement. The juror who had called the matter to the court's attention was excused for cause when he responded that the comment would influence his decision if selected. Additionally, out of an abundance of caution the court further instructed the jurors:

> "Ladies and Gentlemen of the jury panel, one of the prospective jurors, while being questioned, indicated that he had heard another member of the panel state that he or she had overheard a police officer make a statement about the defendant in this present case. I would like to know if any of the prospective jurors present, including the jurors already selected, heard any officer make any statement or heard any reference by anyone else to any statement made by any officer regarding this defendant? All right, no members of

the panel having heard such a statement, I would further like to indicate that I am advised by the Assistant District Attorney that there are no officers or detectives in connection with this case present on this floor at the present time except the gentleman sitting to his right who has been with him the whole afternoon. There are other homicide cases being tried in this vicinity, so therefore any statement, if it were made, could not have applied to the defendant in this case."

We are satisfied that the prompt and prudent remedial measure taken by the trial judge insulated the appellant from any prejudice and eliminated the necessity for dismissing those jurors who had been selected as well as the remainder of the panel. Unquestionably, an accused is entitled to a trial by an impartial jury. *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Commonwealth v. Cornitcher*, 447 Pa. 539, 291 A.2d 521 (1972). However, the possible prejudice of a remark need not necessarily require a declaration of a mistrial where the taint can be removed by an immediate response by the trial court.

The next assignment of error concerns the admission into evidence, over objection, of the testimony of Mrs. Haddie Lesley. Mrs. Lesley testified to a fight she witnessed between appellant and decedent approximately eight to ten months before the killing. We cannot accept the trial court's view that this single incident occurring eight to ten months before the incident in question, would justify the jury to conclude that it was reflective of the type of relationship that existed between the deceased and appellant on February 20, 1973.

While we do permit evidence of prior occurrences to establish malice, motive or intent, this is only so when the prior occurrence is sufficiently related to the offense for which the accused is then standing trial to

satisfy the normal tests of relevancy.[7] However, although we reject the reason assigned by the trial court we do believe that the testimony was properly admitted under this record.[8] In addition to the testimony of Mrs. Lesley, there was other evidence that a tumultuous relationship had existed between the parties for some period prior to the night in question. Included in this testimony was the evidence provided by the relatives of the deceased that she (deceased) had told them of marital difficulties. The deceased also indicated to her relatives that she had been frequently beaten by appellant. Further evidence of the disharmony was shown in a note left by the deceased for appellant. Therefore, the incident related by Mrs. Lesley was not an isolated occurrence but rather another instance in the chain of evidence produced by the Commonwealth to establish the relationship that existed between appellant and the deceased.

7. See *Commonwealth v. Glover*, 446 Pa. 492, 286 A.2d 349 (1972), wherein testimony of altercation several weeks prior to homicide relevant to show ill-will between defendant and victim; *Commonwealth v. Faison*, 437 Pa. 432, 264 A.2d 394 (1970), settled pattern of malice toward victim's mother relevant to show similar feeling of ill-will toward victim; *Commonwealth v. Kravitz*, 400 Pa. 198, 161 A.2d 861 (1960), testimony that accused stated she wanted a divorce and had left her husband out of a recently made will admissible at trial of wife for death of husband; *Commonwealth v. Patskin*, 372 Pa. 402, 93 A.2d 704 (1953), wherein testimony of beating 17 years prior to homicide admissible as showing, with other incidents of continuous marital strife, pattern of malice which defendant had toward his wife; *Commonwealth v. Minoff*, 363 Pa. 287, 69 A.2d 145 (1949), testimony that defendant threatened to kill member of opposing religious sect six months before homicide of victim, who was member of opposing faction of defendant's church, showed quo animo of accused under like mental stimulus toward certain persons with respect to a particular subject.

8. It is a fundamental rule that the action of the trial court will not be reversed where it can be supported even though the court below assigns an improper reason in support of the rule. *Commonwealth v. Dancer*, 460 Pa. 95, 101, n. 5, 331 A.2d 435, 438, n. 5 (1975); *Gilbert v. Korvette, Inc.*, 457 Pa. 602, 604, n. 5, 327 A. 2d 94, 96, n. 5 (1974); *Estate of Prynn*, 455 Pa. 192, 197, n. 9, 315 A.2d 265, 267, n. 9 (1974); *Concord Township Appeal*, 439 Pa. 466, 469, 268 A.2d 765, 766 (1970); *Ridley Township v. Pronesti*, 431 Pa. 34, 37, 244 A.2d 719, 720–21 (1968).

Appellant's next contention is that a handwritten, undated note found in the second floor bedroom was improperly admitted as evidence against him at trial. This challenge attacks the relevancy of this piece of evidence.

 The Commonwealth's evidence established that the handwriting was that of Mrs. Baker and that the note was found in the home on the night of the murder.[9] Further testimony established that Mrs. Baker had in fact spent the weekend with relatives in New York. Although the note was not dated, the information contained within the body thereof was sufficient to permit the jury to conclude that it had been written shortly before she left for New York on the fatal weekend. "Evidence is relevant if it tends to establish some fact material to the case or tends to make [the] facts at issue more or less probable." *Commonwealth v. Hickman*, 453 Pa. 427, 433, 309 A.2d 564, 568 (1973). The contents of this note obviously shed light upon the relationship then existent between the parties and was for that reason relevant. Appellant's argument that the note had been written at some earlier time was an issue of fact to be resolved by the jury.

██ Appellant next contends the remarks made by the Commonwealth in questioning of defense witnesses and in its closing statement to the jury was so prejudicial as to require a new trial. A review of the testimony indicates that on various occasions, the prosecutor's remarks were caustic and his language intemperate. However, we do not believe that such remarks were of the type which would impassion the jury and require a new trial.

---

9. The note read:
"Enjoy your weekend with your friends, who you stood up your so-called wife for (Thursday night). I'll stay close to my family; they are the only ones who care about me. You stay close to your friends.

Jean"

Specifically, the prosecutor referred to a "whirlwind tour" and a "nice little tour", when questioning a defense witness who had admitted to being a drinking companion of appellant the day before the murder. These remarks were objected to and sustained. Also, while cross-examining the appellant, the Commonwealth asked if the reason Baker did not join his wife in New York was because he was "out partying". Defense counsel's objection was overruled and the appellant explained he was not out partying but had gone to work. Taken in context with all the surrounding testimony, we cannot agree that these remarks were prejudicial to the appellant. See *Commonwealth v. Riley*, 459 Pa. 42, 326 A.2d 400 (1974); *Commonwealth v. Goosby*, 450 Pa. 609, 301 A.2d 673 (1973).

Furthermore, we conclude that the objections to the prosecutor's closing remarks are also without merit. At the conclusion of the Commonwealth's argument to the jury, defense counsel stated that he was taking a general exception to the entire statement and then enumerated three specific points.[10]

First, appellant argues he was prejudiced when the Commonwealth impugned the character of its own wit-

**10.** Although appellant has raised numerous additional exceptions at post-trial motions and on appeal to this Court, we believe these points may not properly be considered. In *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272, 274 (1974) we held:
"The trial judge must be given an opportunity to rectify errors at the time they are made. As we have often said before: '[A] party may not remain silent and take chances on a verdict and afterwards complain of matters which, if erroneous, the Court would have corrected.'
*Commonwealth v. Marlin*, 452 Pa. 380, 382, 305 A.2d 14, 16 (1973). *See also Commonwealth v. Morgan*, 448 Pa. 494, 295 A.2d 77 (1972).
Accordingly no longer will allegations of basic and fundamental error serve to enable parties in criminal matters to seek reversal on alleged errors not properly raised below."
While *Clair, supra* dealt specifically with timely objections to presentation of evidence and jury charge, we find that rationale equally compelling in the instant situation concerning the prosecutor's closing statements.

ness, Mary Hughes, by inferring she was romantically involved with appellant and questioning her moral character by referring to her as "too hot to trot and still burning." While one might question the language employed by the prosecutor, we must not lose sight of the fact that a trial is an adversary proceeding. Although the language may not have been in the best taste, it was clearly not of a nature which would ". . . truly inflame or prejudice the jury or have an unavoidable effect of prejudicing the jury to the extent that they would have a fixed bias in their minds, so that they could not objectively weigh the evidence and render a true verdict." *Commonwealth v. Pierce,* 453 Pa. 319, 323–324, 309 A.2d 371, 373 (1973). See also *Commonwealth v. Ross,* 452 Pa. 500, 307 A.2d 898 (1973). Under this record there was more than sufficient testimony to support the inference that appellant and Mrs. Hughes enjoyed a most cordial relationship. Further, the relationship of appellant and Mrs. Hughes was most relevant because it supplied a possible motive for appellant's hostility toward his wife. Thus, the suggestion of a possible romantic involvement between the two was not only justified under the evidence but was also a legitimate factor to be called to the jury's attention. See generally, *Commonwealth v. Goosby, supra; Commonwealth v. Revty,* 448 Pa. 512, 295 A.2d 300 (1972).

The Commonwealth's reference to appellant's "bloody hands" is equally innocuous in that the jury had already heard testimony that appellant's fingers and knuckles appeared bruised and bloodied. The exuberance of counsel's advocacy was properly tempered by the court's instructions.

Appellant next urges that the trial court erred in sending out a written set of possible verdicts with the jury.[11]

11. "1. Did the defendant commit an assault and battery on the decedent, thereby causing her death? If not, the defendant must be found not guilty.

The obvious danger in such a practice is that the jurors may tend to overemphasize the importance of the matters touched upon within such a memoranda and possibly ignore the totality of the oral charge. Heretofore however, nothing in our rules or caselaw has ever specifically condemned such a practice. Pennsylvania Criminal Rule of Procedure 1114 provides:

"Upon retiring for deliberations, the jury shall not be permitted to have a transcript of any trial testimony,

2. If the defendant killed the decedent, was he legally insane at the time? If so, the defendant must be found not guilty.

3. If the defendant killed the decedent, did he do so in self-defense? If so, the defendant must be found not guilty.

4. If the defendant killed the decedent and was not legally insane at the time and did not do so in self-defense, did he kill her with malice (malice being legally defined as either an express intent to kill or inflict great bodily harm or wickedness of disposition, hardness of heart, cruelty, recklessness of consequences and a mind regardless of social duty, indicating an unjustified disregard for the probability of death or great bodily harm and an extreme indifference to the value of human life? If so, the defendant should be found guilty of murder and you must determine the degree.

5. Did the defendant with malice kill the decedent deliberately by design, even if the design was formed very shortly before the killing? If so, you should find the defendant guilty of murder in the first degree.

6. Did the defendant with malice kill the decedent, but without intending to do so? If so, you should find the defendant guilty of murder in the second degree.

7. Did the defendant kill the decedent with malice, but at the time he did so he was so intoxicated that he was incapable of forming a deliberate design to kill or of judging his acts and their consequences? If so, you should find the defendant guilty of murder in the second degree.

8. Did the defendant kill the decedent intentionally, but in the heat of passion and without legally sufficient provocation? If so (malice being here implied), you should find the defendant guilty of murder in the second degree.

9. Did the defendant kill the decedent intentionally, but in the heat of passion without malice and with legally sufficient provocation? If so, you should find the defendant guilty of voluntary manslaughter.

10. Did the defendant kill the decedent unintentionally and without malice, but in the course of an assault and battery in which his state of mind was one of disregard of human life or indifference to consequences? If so, you should find the defendant guilty of involuntary manslaughter."

nor a copy of any written confession by the defendant nor a copy of the information or indictment. Otherwise, upon retiring, the jury may take with it such exhibits as the trial judge deems proper.

Adopted Jan. 24, 1968. Eff. Aug. 1, 1968. Amended June 28, 1974. Eff. Sept. 1, 1974."

In reliance upon this rule, the trial court determined these instructions would be beneficial. This position is not without support in other state and federal jurisdictions.[12] In *Copeland v. United States,* 80 U.S. App.D.C. 308, 152 F.2d 769, 770, cert. denied, 328 U.S. 841, 66 S.Ct. 1010, 90 L.Ed. 1815 (1945), the court stated:

". . . [W]e think it is frequently desirable that instructions which have been reduced to writing be not only read to the jury but also handed over to the jury. This course is required in some states and is widely practiced. United States courts are free to follow it. We see no good reason why the members of a jury should always be required to debate and rely on their several recollections of what a judge said when proof of what he said is readily available." (Footnote omitted)

See also *United States v. Cobb,* 397 F.2d 416 (7th Cir. 1968); *Carrado v. United States,* 93 U.S.App.D.C. 183, 210 F.2d 712 (D.C.1953).

▮▮▮▮▮▮ Despite the above-mentioned precedent, we believe the inherent dangers outweigh the possible benefit to be derived therefrom. Accordingly, we hold that while there was no abuse of discretion by the trial court

12. Further support for this practice is found in the American Bar Association Standards, Trial by Jury § 5.1(a) (Approved Draft, 1968) which states:
"The court in its discretion may permit the jury upon retiring for deliberation, to take to the jury room a copy of the charges against the defendant and exhibits and writings which have been received in evidence, except depositions."

in the instant case, we suggest in the future that this practice should not be followed.

Finally, appellant argues that the court erred in refusing to charge the jury that the negligence of the police in failing to render aid to the decedent is a sufficient intervening cause requiring the jury to return a verdict of not guilty. Appellant claims that the lapse of time in taking Mrs. Baker to the hospital was a direct and substantial factor in causing the death of the victim. We disagree with this interpretation of both the law and the evidence. This Commonwealth has expressly rejected the tort theory of causation in assessing criminal responsibility. *Commonwealth v. Skufca,* 457 Pa. 124, 321 A.2d 889 (1974); *Commonwealth v. Root,* 403 Pa. 571, 170 A.2d 310 (1961). Moreover, in *Commonwealth v. Stafford,* 451 Pa. 95, 301 A.2d 600 (1973), this Court held that if the defendant's actions started a chain of causation which led to the death, then he is guilty of homicide:

"Even assuming that the fall from bed was the immediate cause of death, appellant does not escape criminal responsibility. Unquestionably, the blows to the head were severe and were the direct cause of his deteriorated physical condition which, in turn, ultimately led to his collapsing on the floor. Consequently, appellant is legally responsible for the death since 'one charged with homicide cannot escape liability merely because the blow he inflicted is not mortal, or the immediate cause of death. If his blow is the legal cause, i. e., if it started a chain of causation which led to the death, he is guilty of homicide.' *Commonwealth v. Cheeks,* 423 Pa. 67, 73, 223 A.2d 291, 294 (1966). *See also Commonwealth v. Carn,* 449 Pa. 228, 296 A.2d 753 (1972); *Commonwealth v. Johnson,* 445 Pa. 276, 284 A.2d 734 (1971); *Commonwealth ex rel. Peters v. Maroney,* 415 Pa. 553, 204 A.2d 459 (1964)."

*Id.* at 100, 301 A.2d at 604.

Additionally, the record does not support appellant's thesis that the delay in receiving medical attention caused the death. The medical examiner had testified he believed the cause of death was multiple injuries in the area of the head, chest and abdomen and that because of the significant swelling in the brain area, the injuries to the head alone could have been the cause of death. Thus, the jury had a basis for finding that the blows inflicted by appellant were the immediate cause of death.

Judgment of sentence affirmed.

EAGEN and O'BRIEN, JJ., concur in the result.

ROBERTS, J., filed a dissenting opinion.

POMEROY, J., filed a dissenting opinion.

MANDERINO, J., dissents.

ROBERTS, Justice (dissenting).

I dissent. The trial judge improperly sent out with the jury, over objections by both the Commonwealth and the defense, written questions with answers. He did so to create a "good test case." This unusual procedure prejudiced appellant's right to a fair trial. I also disagree with the majority's extension of the *Clair* waiver doctrine. I would reverse the judgment of sentence and remand for a new trial.[1]

I

The trial court's twenty-six page charge included ten hypothetical questions with answers.[2] These amounted to suggested verdicts and were submitted to the jury on the court's own initiative. After reading the entire

1. Because I find that a new trial is required, I need not discuss the other claims raised by appellant and discussed by the majority.

2. For full text of the questions and answers, see Majority Opinion at 10, note 11.

charge, the court, over objections by both the Commonwealth and the defense, sent out with the jury a single written page with these challenged questions and answers. The trial court attempted to justify this novel procedure by stating: "we may have a good test case."

There is no authority to support the trial court's action. Pa.Rule of Criminal Procedure 1114 permits exhibits to be sent out with the jury, but it specifically forbids giving the jury a transcript of any trial testimony, a copy of any confession by the defendant or a copy of the indictment or information. These limitations are designed to ensure that the jury does not give undue weight to those written materials before them. See *Commonwealth v. Russell*, 456 Pa. 559, 322 A.2d 127 (1974); *Commonwealth v. Canales*, 454 Pa. 422, 311 A. 2d 572 (1973).

Perhaps the dangers of misuse of written instructions could be minimized if the *entire* charge is submitted to the jury. Although the majority addresses this question, it is not at issue here. No jurisdiction has ever allowed a trial court to reduce its charge to a series of simplistic questions complete with mandated verdicts and to submit them in writing to the jury over objections of both the prosecution and defense.[3]

The majority relies on *Copeland v. United States*, 80 U.S.App.D.C. 308, 152 F.2d 769 (1945), cert. denied, 328 U.S. 841, 66 S.Ct. 1010, 90 L.Ed. 1815 (1945). There, the court "quite properly" denied a jury request for submission of instructions after both the defense and prosecution objected. The reviewing court, in dicta, stated that in proper circumstances submission of all written instructions might be appropriate. However, the court specifically noted the very danger present in this case:

"No doubt instructions which he reads and hands over to the jury may make a stronger impression than oth-

---

**3.** Over one-half the states do not allow any written instructions to be sent out with the jury. (See Appellant's Supp.Brief at 2).

er instructions which are not reduced to writing. This difference may or may not be important. When the judge thinks that it is likely to distort the charge as a whole . . . , he may solve the problem by declining to give or by declining to hand over any written instructions, or by reducing his entire charge to writing and reading it to the jury."

Id. at 770. Other federal cases have approved a court's submission of or refusal to submit *all* instructions to the jury. *United States v. Cobb,* 397 F.2d 416, 419 (7th Cir. 1968) ; *McDaniel v. United States,* 343 F.2d 785, 789 (5th Cir. 1965) ; *United States v. Standard Oil Co.,* 316 F.2d 884, 896 (7th Cir. 1963); *Carrodo v. United States,* 93 U.S.App.D.C. 183, 210 F.2d 712, 722–23 (1953); *Doane v. Jacobson,* 244 F.2d 710 (1st Cir. 1957). None of these cases considered whether a judge could submit a question and answer summary of its charge.

Finally, the majority relies on ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Trial by Jury § 5.1 (Approved Draft, 1968). The rule makes no mention whatsoever of submitting written instructions or charge to the jury. The entire text of that standard states:

"(a) The court in its discretion may permit the jury, upon retiring for deliberation, to take to the jury room a copy of the charges against the defendant and exhibits and writings which have been received in evidence, except depositions.

"(b) Among the considerations which are appropriate in the exercise of this discretion are:

(i) whether the material will aid the jury in a proper consideration of the case;

(ii) whether any party will be unduly prejudiced by submission of the material; and

(iii) whether the material may be subjected to improper use by the jury."

Even if the rule were applicable, it would exclude any material which "may be subjected to improper use by the jury," an issue the majority fails to address.

The court's procedure in this case could only encourage the jury to ignore the court's general instructions and to reach a verdict without a complete analysis of the issues involved. For example, the full legal definitions and implications of such legal concepts as "intent", "provocation" and "insanity" are left undefined in the challenged hypotheticals set out with the jury. This could have created an impression with the jury that the court considered such definitions unimportant and is similar to an instruction to consider only part of the evidence. Moreover, the jury might have also structured its entire deliberation solely around answering these questions, thus short-circuiting full consideration of all the evidence and the general instructions. These dangers jeopardized defendant's right to a fair trial.

The trial court, in its sua sponte search for a "test case" involving an essential aspect of a trial for a serious offense, proceeded in the face of objections from both the Commonwealth and the defense. That search created unnecessary burdens and hazards for the Commonwealth, the appellant, and the judicial process itself. A trial court should not be inhibited from clarifying issues, explaining legal precepts to the jury or generally furnishing the jury "guide and compass." The submission of questions and answers, the procedure followed here, does not serve this purpose. The majority's mere "suggestion" to abandon this practice in the future is an inadequate disposition. The only proper disposition of this case is to hold that the trial court abused its discretion and to award appellant a new trial.

## II

I must also express my disagreement with the majority's assertion that appellant's claim concerning the dis-

trict attorney's allegedly inflammatory closing argument has been waived. The majority reaches this conclusion by a new and unnecessary extension of the *Clair* waiver doctrine. *Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974). The rationale for requiring timely objections was stated in that opinion:

" '(1) Appellate courts will not be required to expend time and energy where no trial ruling has been made. (2) The trial court may promptly correct the asserted error. With the issue properly presented, the trial court is more likely to reach a satisfactory result thus obviating the need for appellate review on this issue. Or if a new trial is necessary, it may be granted by the trial court without subjecting both the litigants and the courts to the expense and delay inherent in appellate review. (3) Appellate courts will be free to more expeditiously dispose of the issues properly preserved for appeal. Finally, the exception requirement will remove the advantage formerly enjoyed by the unprepared trial lawyer who looked to the appellate court to compensate for his trial omissions.' "

*Id.* at 420, 326 A.2d at 273–74 (quoting from *Dilliplaine v. Lehigh Valley Trust Company,* 457 Pa. 255, 259, 322 A. 2d 114, 117 (1974)).

Here, appellant made specific and general objections immediately following the remarks and the issue was fully argued at post-trial motions. Thus, a "trial ruling has been made." By objecting immediately following the close of the argument, the trial court could have "promptly correct[ed] the asserted error" by making specific cautionary instructions to the jury or by ordering a mistrial. There is no allegation that appellant's counsel was "unprepared." Thus, none of the rationales of *Clair* are applicable.

The alleged error has been fully argued before both the trial court and this Court and has been "properly preserved for appeal." There is no reason for this Court

not to decide whether the inflammatory remarks denied appellant a fair trial. Moreover, the majority's new *Clair* rule makes it necessary for defense counsel to object as the district attorney's prejudicial remarks are being uttered in order to preserve an objection. Such a procedure could seriously disrupt the trial with no gain in either the quality or the effectiveness of the proceeding. Further, the full prejudicial nature of the closing remarks may not be immediately recognizable through no fault of counsel because they may be cumulative in nature.

There is no procedural or policy justification for the majority's new waiver rule. It is a rule without a reason. Objections raised immediately following a district attorney's closing argument afford sufficient timely notice for the trial court to rule on and to correct the claimed error. Such objections preclude an imposition of a waiver.

POMEROY, Justice (dissenting).

In my view, the purpose and intent of the trial judge to assist the jury in its consideration of the somewhat complicated legal issues involved in this case is deserving more of commendation than condemnation. I cannot agree, however, that the means utilized was proper without the consent of the parties or that the defendant may not have been prejudiced. The Court's opinion recognizes that "the inherent dangers [of the device here employed] outweigh the possible benefits to be derived therefrom." Opinion of the Court, *ante* at 414. That being so, I see no alternative to awarding a new trial, and I therefore dissent from the order of affirmance.